Filed 5/16/24  P. v. Hernandez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROGER FRANCISCO HERNANDEZ,<br><br>    Defendant and Appellant. | D080959<br><br><br><br>(Super. Ct. No. SCS304652) |

APPEAL from a judgment of the Superior Court of San Diego County, Dwayne K. Moring, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Roger Francisco Hernandez appeals from a judgment following convictions on one count of murder in violation of Penal Code section 187, subdivision (a), one count of attempted murder in violation of Penal Code sections 664 and 187(a), and one count of shooting at an occupied vehicle in

violation of Penal Code section 246. Hernandez contends the convictions should be reversed because the trial court prejudicially erred in allowing into evidence his statements to an undercover detective and confidential informant, and in excluding certain defense evidence pertaining to third-party culpability. Hernandez also contends the convictions should be reversed for prosecutorial misconduct. Finally, he contends his sentence should be modified because the trial court erred in not striking firearms enhancements. The Attorney General disagrees, and so do we. Hence we affirm the conviction.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a shooting that occurred in National City in 2015.

### A.    *The Shooting*

On the evening of October 11, 2015, 18-year-old Carlos M. and his friend, 17-year-old Juan M., were traveling in a car on Prospect Street in National City. As they approached a stop sign and prepared to make a U-turn at 16th Street, a second car pulled up on their left and cut them off. Then an occupant of the second car stepped out onto the street with a semi-automatic Springfield .45 caliber XDS model pistol, asked Juan "do you bang?" or "where are you from?" and began shooting bullets into the car at Carlos and Juan. The bullets injured Carlos, and killed Juan.

### B.    *The Investigation*

In the course of their investigation into the shooting, detectives directed an investigative technique known as a *Perkins* operation[1] at a

---

[1]    The term "*Perkins* operation" derives its name from *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), discussed *post*.

2

member of the Shelltown street gang named Marcos Vasquez. As described by a detective, in a *Perkins* operation:

> "We . . . place either an undercover officer or an informant in the jail cell with the suspect, and we then . . . stimulate the suspect . . . with something regarding our investigation, to get them talking and confiding in whoever is in the cell with them about what the detectives are trying to talk to them about in the hopes of getting some admission or confession of the crime."

Vasquez made no self-incriminating statements in this *Perkins* operation. But, as discussed *post*, the same cannot be said of *Hernandez*, in relation to a *Perkins* operation that, three years later, was directed at *him*.

## C. *The Trial, Verdict, and Sentencing*

Three days after making self-incriminating statements in the *Perkins* Operation directed at him (the *Perkins* Operation), Hernandez was charged with the counts listed above. A jury returned a verdict of guilty on all counts and made true findings relating to the use of a firearm and infliction of great bodily injury and death. The trial court sentenced Hernandez to a term of 67 years to life. Hernandez timely appealed.

## II.

## DISCUSSION

As noted above, Hernandez bases his appeal on four distinct contentions.

## A. *Admission of Evidence Gleaned from Perkins Operation*

Hernandez's first contention is that the trial court prejudicially erred in denying a motion to suppress the statements he made to undercover operatives during the *Perkins* Operation. Those statements, he contends, were elicited in violation of his constitutional rights to be afforded due process and to not be compelled to incriminate himself. In determining whether a trial court erred in denying a motion to suppress a defendant's

3

statements, " ' " "[w]e independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

In approaching our responsibility to make this determination, we begin with what transpired during the *Perkins* Operation.

### 1. The *Perkins* Operation[2]

On the evening of November 6, 2018, Hernandez (who was in custody on other charges) was placed in a cell in which two undercover operatives posing as fellow detainees were already present. Operative No. 1, a seasoned confidential informant who was paid $1500 to participate in the operation, carried himself as an experienced inmate—either a gang member or gang-wise—who was facing charges for conspiracy to commit murder for hire, conspiracy to kidnap, and rape. Operative No. 2, a detective, carried himself as an inexperienced inmate from Tijuana who had been "caught at the border with cocaine" and was facing charges involving transportation of narcotics and attempted murder. Both operatives were older than Hernandez, who was 30 years old at the time of the *Perkins* Operation.

---

[2]     Our rendition of what occurred in the holding cell during the *Perkins* Operation is drawn from audiotapes of the *Perkins* Operation, transcripts of those audiotapes, and testimony of the undercover detective to whom we refer *post* as Operative No. 2. During the operation, each of the three occupants of the holding cell—Operative No. 1, Operative No. 2 and Hernandez— alternated frequently between English and Spanish. For instances in which Spanish was spoken, the transcripts include both the Spanish and an English translation. At trial, the trial court instructed the jury that, for such instances, the jury must rely on the English translation. Excerpts quoted in this opinion that derive in part or in full from words spoken in Spanish are drawn from the English-language translation.

4

Over some four and one-half hours, Hernandez and the operatives engaged in a variety of conversations comprising a variety of topics, including, for example: boredom, prison food, family matters, gang affiliation, experiences with law enforcement, why they were being held, cold cases, DNA evidence, witnesses, and other topics. These interactions, and the stretches of silence with which they were interspersed, varied in duration. The tenor of the interactions ran a gamut of moods, including boredom, bravado, gravity, jocularity, and irritation.

At times, Hernandez and the operatives complained about conditions in the cell. For example: Hernandez commented to the effect that the cell was cold[3] and its toilet broken;[4] and the operatives complained about the seating being uncomfortable and about having been waiting in the cell for hours. In addition, the undercover detective (Operative No. 2) testified at trial that he did not think food had been brought to the cell during the operation.

At one point in the operation, officers removed Hernandez from the cell to participate in a (pretextual) lineup. Then they returned him to the cell; and, in response to inquiries from the operatives, Hernandez said that he hadn't killed anyone and that he thought he had not been identified in the lineup.

Later, a detective came to the cell and told Hernandez, within earshot of the operatives, (i) that he (the detective) and his partner were investigating a three-year-old homicide, (ii) that a witness had identified

---

3    E.g.: "They should bring a fucking blanket." "Can I get a blanket at least, a cheap-ass blanket?"

4    E.g.: "Hey Dep[uty], can you ask them if they can hurry up cause I need to take a shit and this toilet doesn't work."

5

Hernandez in the lineup, (iii) that they (the detectives) would be speaking with him about the matter shortly, and (iv) that "[y]ou need to start thinking about what you're gonna talk to us about . . . [c]ause this guy was murdered by you."

When the officers left, Operative No. 1 challenged Hernandez about his (Hernandez's) previous statement to Operative No. 2 to the effect that he did not think he had been identified in the lineup:

> "Operative No. 1: I thought you said they didn't pick you out, my boy?
>
> "Hernandez: Huh?
>
> "Operative No. 1: I thought you said they didn't pick you out. I thought you said they didn't pick you out.
>
> "Hernandez: Who?
>
> "Operative No. 1: Upstairs when you went to line-up.
>
> "Hernandez: Yes.
>
> "Operative No. 1: You're a homie?[5]
>
> "Hernandez: Yeah. (Unintelligible) they just—just went over there and they put us in there and everything. I don't know. Fuck it.
>
> "Operative No. 1: I'm just saying, my boy. 'Cause you know, you're asking the homie [Operative No. 2] what he's

---

[5]    As the undercover detective (Operative No. 2) testified at trial, the term homie "usually means they are involved in a Southern California street gang or associated with one," whereas the term paisa "[u]sually refers to a Mexican national or just a Mexican who is not affiliated with Southern California street gangs." When asked by Operative No. 1 whether he was a paisa or a homie, Hernandez responded: "Hom[ie]."

6

here for, what I'm here for, my boy.[6]  And when I ask you a simple question, you say you're a homie, my boy, you know?

"Hernandez:  Yeah, I told you.

"Operative No. 1:  No, and then you say you know—no, you haven't, my boy, you know?

"Hernandez:  Nah, but I shouldn't have to (unintelligible).

"Operative No. 1:  Yeah, but still, my boy, you know?  It's like, you say you're a homie, my boy.  We're tryin' to see what's up with you, my boy.  You're over here and we ask—I ask you a simple question, you know?  You asked the homie a question, you asked me a question, homie, you know?

"Hernandez:  Yeah.

"Operative No. 1:  And then we're asking you, my boy.  You disappear and you come back and, you know?

"Hernandez:  That's all (unintelligible).

"Operative No. 1:  I'm here (unintelligible), my boy and the homie's over here from—you know, I could vouch for the homie, you know?

"Hernandez:  Yeah.

"Operative No. 1:  And again, it's like I asked—I asked you something, homie, and it's like—what am I supposed to think, you know?

"Hernandez:  Yeah.

"Operative No. 1:  It's kinda fishy, homie, you know?  I asked you a simple, 'Hey, did they pick you out, my boy?' You're like, 'No, no, no.'  (Unintelligible), homie, you know?

---

6    Earlier during the *Perkins* Operation, Hernandez had asked his cellmates why they were being held.

"Hernandez: No, 'cause they put two of us and then they just took us to the tank and they separated us. And right now it's all (unintelligible). Fuck, nah."

Immediately following this exchange, Operative No. 1 shifted the topic of conversation to potential charges and witnesses:

"Operative No. 1: What's up with you? They trying to hit you with that shit or what?

"Hernandez: Yeah. Trying for murder. (Unintelligible).

"Operative No. 1: I'm here for conspiracy and all that, my boy, you know?

"Hernandez: Yeah.

"Operative No. 1: I'm in the business, my boy, you know?

"Hernandez: Yeah.

"Operative No. 1: Are they ratting you out?

"Hernandez: Huh?

"Operative No. 1: Are they ratting you out?

"Hernandez: (Unintelligible).

"Operative No. 1: Do you know what neighborhood the ones who are ratting you out are from?

"Hernandez: Huh-uh."

Then, following a series of exchanges pertaining to where Hernandez had previously been incarcerated, Operative No. 1 began dispensing advice:

"Operative No. 1: Fuck that, homie. You don't gotta talk to them. You don't have to tell them shit, homie, you know? So just get your ducks in—in line, you know? When you fucking rat out like that, homie, you gotta move, homie, you know? That's your—that's your ass right there, you know? Fuck that shit, homie. If they picked you like that, it's because you have the rat on the other side, homie, you know?"

From here, the conversation drifted to a variety of other topics, including Hernandez's gang affiliation, the circumstances of Hernandez's arrest, DNA evidence and the prosecution of cold cases, legal representation, interactions with law enforcement personnel, the lineup, family, law enforcement activities directed at Hernandez over time, pending cases, and the like.

Then officers again removed Hernandez from the holding cell—this time taking him to an interview room, where he invoked his Miranda rights. When Hernandez was returned to the cell, he boasted about how he had resisted the officers' inquiries. Then conversation turned to the topic of witnesses:

> "Hernandez: [The officer] said that the only thing that he had was supposedly that witness.
>
> "Operative No. 1: Witness?
>
> "Hernandez: (Unintelligible) I mean, he remembered after three years ago?
>
> "Operative No. 1: But there are guys that fucking turned [*sic*] because they're very busted, man.
>
> "Hernandez: Yeah.
>
> "Operative No. 1: You know?
>
> "Hernandez: But it's been . . .
>
> "Operative No. 1: Were you with anyone, like maybe a homie of yours?
>
> "Hernandez: U-huh. Yeah, but that guy doesn't— (unintelligible)."

With that, Hernandez proceeded to make a variety of self-incriminating statements, including, for example, statements to the effect that: the shooting had resulted from a chance encounter between himself along with a

9

companion in one car and the occupants of another car who "went by all bad ass;"[7] he had fired bullets from "a .45" through the side of the other car, striking two occupants, including one of them in the face; he had felt aroused at the time of the shooting;[8] the gun he had used was "clean;" the gun had "throw[n] . . . casings" during the shooting, but he had not touched them; when he had finished shooting, he saw that the other car's driver lay motionless; after making this observation, he and his companion drove away from the scene, his companion disposed of the gun, the two of them washed and cleaned the car and also disposed of its tires; and his companion was smart[9] and trustworthy and unlikely to turn on him.[10]  Then the conversation drifted to topics associated with custodial amenities, such as the

---

[7]     According to the testimony of two witnesses at trial, Juan "dressed like a . . . gangster."

[8]     " 'Operative No. 1: 'What did you feel afterwards, man?'  Hernandez: 'No, fucking. . .'  Operative No. 1: 'Fucking boner, huh?'  Hernandez: 'Yes, man.' "

[9]     "He's smart," Hernandez told his cellmates.  "The team we have, we're not fucking around."  "[T]he fucking squad that we have, man . . . they don't fuck around."

[10]     Notably, some of Hernandez's self-inculpatory statements deviated from other evidence related to the shooting.  For example, Hernandez told his cellmates that "[t]here were four of them," yet all other indications (including the testimony of Carlos) were that, at the time of the shooting, no one other than Carlos and Juan had been present in the car in which they were shot. As another example, whereas Hernandez told the operatives that he had shot the *passenger* (i.e., Carlos) in the face, the testimony of other witnesses indicated that it was only the *driver* (i.e., Juan) who had sustained gunshot injuries in that area of the body.

quality, desirability, and cost of food available in prison relative to food available in jail.

### 2. Analysis

#### a. *Legal Principles*

As noted above, Hernandez contends the *Perkins* Operation violated his constitutional rights against self-incrimination and to due process. Pivotal to our analysis of this argument are three United States Supreme Court opinions and one California Supreme Court opinion that speak to the topic of coercion in the context of questioning a suspect in a custodial setting: *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); *Perkins, supra,* 496 U.S. 292; *Arizona v. Fulminante* (1991) 499 U.S. 279 (*Fulminante*); and *People v. Fayed* (2020) 9 Cal.5th 147 (*Fayed*).

#### i. Miranda and Perkins

In *Miranda*, the Court held "that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." (*Perkins, supra,* 496 U.S. at p. 296.)

In *Perkins* the Court limited the reach of *Miranda* by stating that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" (*Perkins, supra,* 496 U.S. at p. 296) and then expressly holding "that an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." (*Perkins,* at p. 300.) In so holding, the Court explained that "the essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." (*Id.* at p. 296.) "When a suspect considers himself in the company

11

of cellmates and not officers, the coercive atmosphere is lacking." (*Ibid.,* quoting *Miranda, supra,* 384 U.S. at p. 449.)

Expounding further on this reasoning, the Court in *Perkins* observed that "[t]here is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (*Perkins, supra,* 496 U.S. at pp. 296–297.) Whereas "[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, [w]hen the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." (*Id.* at p. 297.) Inasmuch as "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner[,] [p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." (*Ibid.*) On the basis of this reasoning, the Court stated that "*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates" (*Perkins,* at p. 298) and that, in situations in which "the suspect does not know that he is speaking to a government agent[,] there is no reason to assume the possibility that the suspect might feel coerced." (*Id.* at p. 299.)

In focusing on the differential in power dynamics—as between, on the one hand, a suspect engaging with a government agent he believes to be an officer of the law and, on the other hand, a suspect engaging with a government agent he believes to be a fellow inmate—the Court did not say that the danger of compulsion or coercion should be deemed to be *absent*

12

whenever the latter type of interaction occurs.  Rather, as revealed in the passages quoted *ante*, it stated (repeatedly) that compulsion or coercion should not be *assumed* in such an interaction.  (See, e.g., *Perkins, supra,* 496 U.S. at pp. 293, 297, 299.)

### ii.     Fulminante

One year after issuing its opinion in *Perkins*, the Supreme Court issued an opinion in a different case—*Fulminante*—that demonstrates the point that *Perkins* must not be interpreted as suggesting that a confession elicited by an undercover operative may never be held to be coercive and thus inadmissible.  In *Fulminante*, an incarcerated FBI informant named Sarivola, who had been both a police officer and a participant in organized crime, befriended a fellow inmate—Fulminante—who was rumored to be a suspect in the killing of a child.  (*Fulminante, supra*, 499 U.S. at p. 283.)  In conversations with Sarivola, Fulminante denied involvement in the child's death, but supplied inconsistent accounts regarding his knowledge or lack of knowledge thereof.  One evening, after having reported these conversations to an FBI agent and been instructed by the agent to find out more, "Sarivola [told Fulminante] that he knew Fulminante was 'starting to get some tough treatment and whatnot' from other inmates because of the rumor."  (*Ibid.*)

> "Sarivola offered to protect Fulminante from his fellow inmates, but told him, ' "You have to tell me about it," you know.  I mean, in other words, 'For me to give you any help." ' [Citation]  Fulminante then admitted to Sarivola that he had driven [the child] to the desert on his motorcycle, where he choked her, sexually assaulted her, and made her beg for her life, before shooting her twice in the head."

(*Fulminante,* at p. 283.)  Fulminante moved unsuccessfully to suppress his confession to Sarivola and was convicted of the child's murder and sentenced to death.  (*Ibid.*)

The conviction was appealed to the Arizona Supreme Court, and then to the United States Supreme Court, which "agree[d] with the Arizona Supreme Court's conclusion that Fulminante's confession [had been] coerced." (*Fulminante, supra*, 499 U.S. at p. 287.) Although it said "the question is a close one," the high court nonetheless likened the situation to a case in which it had "found that a confession was coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door." (*Id.* at p. 288, citing *Payne v. Arkansas* (1958) 356 U.S. 560, 564–565, 567.)

> "[S]o too here, the Arizona Supreme Court found that it was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess. Accepting the Arizona court's finding . . . that there was a credible threat of physical violence, we agree with its conclusion that Fulminante's will was overborne in such a way as to render his confession the product of coercion."

(*Fulminante, supra*, 499 U.S. at p. 288.)

### iii.     Fayed

More recently, in *Fayed*, California's Supreme Court has had occasion to interpret *Miranda*, *Perkins*, and *Fulminante* in the context of a case involving a *Perkins* operation in which an incarcerated confidential informant purported to be in a position to assist his cellmate in engaging the services of a hitman. In that case, a defendant (Fayed) accused of having murdered his estranged wife (Pamela) told the informant (Smith) at a time when Smith was wearing a wire "that he [Fayed] had paid [an individual named] Moya to murder Pamela and asked Smith to solicit Smith's fictional hitman 'Tony' to kill Moya to eliminate him as a witness." (*Fayed, supra,* 9 Cal.5th at p. 157.) Fayed was then charged with murder and conspiracy; and, like the defendant in *Fulminante*, was convicted and sentenced to death (*id.* at p. 158) after

14

having moved unsuccessfully in the trial court to suppress his confession. (*Id.* at pp. 160–161.) But, whereas Fulminante's conviction was reversed, Fayed's conviction was affirmed.

In affirming Fayed's conviction, the California Supreme Court quoted and discussed *Miranda*, *Perkins*, *Fulminante*, and several of their progeny at length and, in so doing, observed that:

> " 'The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement.' [Citations.] ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' "

(*Fayed, supra,* 9 Cal.5th at p. 165; cf. *People v. Maury* (2003) 30 Cal.4th 342, 411 [" 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' "].)

The Court acknowledged that, in the recorded conversation between Fayed and Smith, "Smith [had been] much more than a passive listener," that he had "appeared to ingratiate himself by expressing sympathy for [Fayed] and commiserating with [Fayed] on how Moya and his cohorts bungled Pamela's murder," that he had "asked [Fayed] specific, and arguably leading, questions about Pamela's killing," and that he "at times [had] coaxed and prodded [Fayed] when [Fayed] hesitated to speak." (*Fayed, supra,* 9 Cal.5th at p. 166.) But the Court nonetheless rejected Fayed's fifth amendment and due process arguments because, it concluded, "the record [did] not support that [Fayed's] will was overborne." (*Ibid.*)

> "[W]e cannot conclude that Smith's questions or tactics were likely to procure an untrue statement or were

15

otherwise improper. (See *Arizona v. Fulminante, supra,* 499 U.S. at p. 287 [coercion due to 'credible threat of physical violence' if defendant did not confess].) [I]t is clear from the record as a whole that defendant was neither compelled into revealing his role in Pamela's murder, nor was he coerced into hiring a hitman to kill Moya. If the ' "decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." ' "

(*Fayed,* at p. 166.)

### b. *Application of Legal Principles*

Against the backdrop of these opinions, Hernandez argues the "rule in *Perkins . . .* should not apply" to this case because (i) a power imbalance existed between himself and the operatives, (ii) the holding cell was uncomfortable, and (iii) his self-inculpatory statements were not elicited until after he had invoked his right to remain silent under *Miranda.* We are not convinced.

Insofar as a claimed power imbalance is concerned, Hernandez points to the facts that he was detained and confined in a small room with the operatives, that the operatives "represented gang affiliation" and were older than he was, and that they asked him questions about the shooting, said someone must have turned on him, and said they "suspected him of not telling the truth which in the gang world could mean deadly retaliation."

It is true that, at one juncture during the *Perkins* Operation, Operative No. 1 probed and characterized as "fishy" a supposed discrepancy between, on the one hand, Hernandez's expressed belief that he had not been identified in the lineup and, on the other hand, a detective's subsequent statement that Hernandez *had* been identified in the lineup. (See *ante.*) But to convert this brief excerpt from the cell occupants' wide-ranging conversation over the course of several hours into the equivalent of a threat to occasion harm to Hernandez if he did not confess is to make too much of too little.

16

Hernandez could easily have responded by pointing out, as was obvious, that he was in no position to know whether he had or had not, in fact, been identified by the witness (who had been behind a one-way mirror). So, too could he have declined to discuss the details of his case. As experts for the prosecution and the defense testified: In Hispanic street gang prison culture, it is impermissible and risky for a gang member to *lie* when asked by an older gang member about one's involvement in criminal activity, but there is no proscription against respectfully declining to talk about such activity. Thus, in the words of Hernandez's expert, it may be necessary to disclose to fellow incarcerated gang members "what you're charged for . . . , but you don't have to talk about specifics about your case."

In our review of the recordings/transcripts from the *Perkins* Operation, we note that many of Hernandez's self-inculpating statements were made in response to questions seemingly casually posed by Operative No. 1. However, we perceive in Hernandez's equally casual sounding and at times boastful responses nothing to suggest that those responses were given hesitantly, unwillingly, or insincerely. Nor do we discern anything in what transpired in the cell to suggest that Hernandez felt intimidated or otherwise ill at ease with his cellmates, that he perceived a need to be protected from them or by them, or that his will was in any way overborne or his statements made in a manner that rendered them involuntary or unreliable.

Turning to Hernandez's assertion that the conditions in the cell were uncomfortable—in the words of the opening brief, "the conversation at issue here continued for hours in a small cold cell [with] no functioning toilet and no food"—we again find no coercion. Of course, jails are neither known nor expected to be among the most comfortable of accommodations. But even taking this circumstance into account, we note with regard to the elements

17

just listed:  that, according to the undercover detective (Operative No. 2), the cell was neither especially cold nor configured to be any less comfortable than any other cell; that, whatever may have been the condition of the toilet in the cell, Hernandez's own remarks to the operatives reveal that he used a toilet elsewhere in the jail during the operation; and that, while the occupants of the cell did converse at length about food during the operation, nothing in Hernandez's remarks suggested he was hungry.

As for Hernandez's citation to his "prior refusal to talk to the police about the case" as a reason for us to conclude that "[t]he rule in *Perkins* should not apply" to this case, we note "California courts have uniformly come to the conclusion that *Perkins* [not *Miranda*] controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 815; see also *id.* at pp. 813–815.)

**B.    *Exclusion of Evidence Pertaining to Vasquez***

Hernandez's second contention on appeal is that the convictions should be reversed because the trial court prejudicially erred in limiting the evidence he could use to deflect suspicions onto the target of the other *Perkins* operation:  Vasquez.  In excluding some of the evidence that Hernandez sought to use for this purpose, the trial court invoked Evidence Code section 352, which provides that:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

A trial court's rulings under Evidence Code section 352 are reviewed for an abuse of discretion.  (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1125.)

### 1. The Evidence Pertaining to Vasquez That Was Admitted

At trial Hernandez sought to sow reasonable doubt by adducing evidence that the shootings had been committed by somebody else. Chief among the suspects onto whom he sought to deflect culpability were Ricardo Flores, Peter Burgos, and Vasquez. The trial court ruled Hernandez could present evidence as to potential culpability on the part of each of these three individuals, but it imposed certain limits.

As to Vasquez in particular, Hernandez sought to establish that Vasquez had a motive to harm Juan and that Vasquez had confessed to the shooting. In support of the motive, Hernandez elicited evidence that Juan "had a dislike of . . . Shelltown," the street gang to which Vasquez belonged. In support of a confession, Hernandez called as a witness an incarcerated Shelltown gang member who stated: that, "[p]robably sometime in the middle of 2015 or something," he had briefly encountered a Shelltown gang member who introduced himself as "Scrappy"[11] and that, during a short (three-minute) conversation on the trolley, this Scrappy, who he had just met,[12] told him that "him and some of the homies went out and put some shots in guys in National City."

---

[11]    "Scrappy" is a moniker used by Vasquez.

[12]    This testimony was vague and implausible in certain respects; and it was impeached, not only by the prosecution, but also, for varying reasons and in different respects: by counsel for *the defense*; by *Hernandez,* who, during the *Perkins* Operation, had expressed disgust at "guys" from "another fucking neighborhood . . . taking the credit" for the shooting; and by *the witness himself*, who testified that he did not believe what Scrappy had told him because he (the witness) later learned that a gang member named Cyclo, who Scrappy had said was with him at the time of the shooting, had instead been incarcerated at the time.

## 2.    The Evidence Pertaining to Vasquez That Was Excluded

Although the trial court admitted the evidence of Vasquez having had a motive to harm Juan and of Vasquez having confessed to the shooting, it excluded evidence relating to two homicides—one resulting from a drive-by shooting, the other resulting from a jailhouse beating—as to which charges were pending against Vasquez at the time of trial.

The drive-by shooting occurred in 2018, on the same day that its victim had been "rough[ed] up" at a liquor store. One or more of the victim's assailants had been observed departing the liquor store in a dark gray Nissan Altima after the "roughing up." When the car was pulled over later that day (after the homicide), its occupants included Vasquez and two other men, one of whom admitted that he and Vasquez had "rough[ed] up" the victim earlier that day. The jailhouse beating occurred in 2020, when Vasquez, while in custody for the 2018 drive-by shooting, participated "along with four other men . . . [in a] jail beatdown" that resulted in a prisoner's death.

Hernandez argued that evidence of the 2018 drive-by shooting and 2020 jailhouse beating should be admitted in support of his third-party culpability defense because those crimes were similar to the 2015 drive-by shooting for which he was being tried. In support of this argument, he pointed out that all three incidents were homicides being charged as murders, that the two drive-by shootings had occurred not long after the victim(s) had been present in a liquor store, and that in each instance the assailants had been described as traveling in a gray Nissan Altima.

The prosecution countered that the jailhouse beating bore no similarity at all to the 2015 drive-by shooting, and that the only similarity between the two drive-by shootings was the description of the assailants' car:

> "There's no altercation in the liquor store [in 2015], unlike
> the second shooting [in 2018]. Carlos . . . says, 'There was

20

absolutely no confrontation with anybody. We bought the drinks and snacks. Went to [Juan's] house, got a sweater, drove back.'

"When they pulled up on 16th and Prospect, they didn't know they were being followed. A car comes and blocks them in. Someone says, 'Where are you from?' And begins shooting them. Mr. Hernandez himself describes the motive for this in his *Perkins* Op saying, 'Enemies drove by us, and we are trying to look tough.' So we said, 'Let's go kill someone.' Got in the car and drove off.

"I don't think this is consistent with a fight at a liquor store or an altercation at a liquor store. The fact that there is a liquor store and people bought something at a liquor store before, I don't think [the fact patterns in the two cases are] consistent."

At the conclusion of the arguments of counsel, the trial court ruled that evidence of the 2018 drive-by shooting and 2020 jailhouse beating would be excluded:

"I'm denying your motion in regards to [the] subsequent [2018] drive-by shooting or [2020] jailhouse homicides. I'm excluding that under 352. That it would be too time-consuming and also it doesn't appear that it's relevant. It takes place after this incident and I'm not satisfied that there's [enough] similarity for it to be direct or circumstantial evidence of third-party culpability."

### 3. Analysis

In evaluating the trial court's decision to exclude evidence of the 2018 drive-by shooting and 2020 jailhouse beating, we are guided by the evidentiary principles set forth in *People v. Elliott* (2012) 53 Cal.4th 535, 580 (*Elliott*). " '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt . . . must link the third person either directly or circumstantially to the actual perpetration of the crime.' " (*Ibid.*) " 'In

21

assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' " (*Elliott,* at p. 580.) "Evidence of a third party's prior crimes is inadmissible to establish the third party's criminal propensity." (*Ibid.*) "For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, ' "[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' " (*Id.* at p. 581.)

Reviewing the trial court's reasoning with these principles in mind, we conclude no abuse of discretion occurred here. Certainly, the 2018 and 2020 killings that led to charges against Vasquez bore some similarities to the 2015 killing that led to charges against Hernandez: each was a violent homicide; and two were drive-by shootings involving a victim who had been present at a liquor store and assailants who were linked to a similarly described car. But "those common features, whether considered separately or together, are not so unusual and distinctive as to be like a signature" (*Elliott, supra,* 53 Cal.4th at p. 581); and it was reasonable, and not an abuse of discretion, for the trial court to "conclude under Evidence Code section 352 that the probative value of the evidence, if any, was substantially outweighed by the undue consumption of time required for its presentation and the substantial danger of confusing the issues." (*Ibid.*)

## C.    *Alleged Prosecutorial Misconduct*

Hernandez's third contention on appeal is that the convictions should be reversed because, in closing arguments, the prosecution engaged in misconduct by misstating testimony of defense expert Iris Blandon-Gitlin, Ph.D. "A claim of prosecutorial misconduct is governed by the abuse of

22

discretion standard of review." (*People v. Lima* (2022) 80 Cal.App.5th 468, 477 (*Lima*).)

## 1. Testimony of Dr. Blandon-Gitlin, and Remarks of Prosecutor

On direct examination, Dr. Blandon-Gitlin testified that her field of research "involve[d] . . . the psychology of interviewing, interrogations, and confessions." Defense counsel elicited testimony from her about interrogation techniques, contextual factors that influence confessions, and the reliability— or unreliability—of confessions. On cross-examination, Dr. Blandon-Gitlin conceded that there were no peer reviewed studies or journal articles applying to *Perkins* operations and that she was unaware of any instance in which an admission made in a *Perkins* operation had been forensically proven to be false. Then, the following day, during closing arguments, the prosecution stated:

> "We . . . heard [Dr. Blandon-Gitlin] doesn't do research into *Perkins* operations. She does in confessions. There is not a study in *Perkins* operations that says anything about this is unreliable. And there has never been a verified false confession from a *Perkins* [o]peration."

Hernandez did not object to these statements at trial. However, on appeal he argues that they mischaracterized Dr. Blandon-Gitlin's testimony and that the mischaracterization constituted prejudicial misconduct.

## 2. Analysis

In response to Hernandez's argument, the Attorney General contends: that the argument is forfeited because Hernandez failed to object at trial; that the prosecution's remarks should be understood, not as a recap of what Dr. Blandon-Gitlin had said in her testimony, but rather as inferences the prosecution was arguing should be drawn therefrom; and that, even if the

23

prosecution's remarks did cross the line into misconduct, any fallout should be considered harmless.

We need not address either of the latter two arguments because the first is decisive.  " '[T]o preserve a claim of prosecutorial misconduct for appeal, " ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety." ' [Citation.]  The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm." ' " (*Lima, supra,* 80 Cal.App.5th at p. 478.)  Here, Hernandez "failed to object and request an admonition regarding [the prosecution's closing] comments at trial.  Nothing in the record suggests that an objection would have been futile or that an admonition would have failed to cure any harm.  We conclude, therefore, that defendant forfeited his challenges to these comments."[13]  (*People v. Adams* (2014) 60 Cal.4th 541, 575.)

---

[13]    Hernandez argues that objecting would have been futile and that any admonition would have been, not just "ineffective," but "counterproductive" inasmuch as "it would have encouraged the jurors to focus more on what the prosecutor said, making the prejudice worse."  In addition, he argues in the alternative that Hernandez's trial counsel "was ineffective in failing to object."  But we do not view the subject matter of the prosecution's remarks as being so freighted with negative connotations that it would have placed the defense in a catch-22 with respect to whether to object. Nor do we find a basis on which to conclude that the absence of an objection—whether intentional or through inadvertence—amounted to ineffective assistance.  (Cf. *People v. Riel* (2000) 22 Cal.4th 1153, 1202 [one "cannot automatically obtain merit review of a noncognizable issue by talismanically asserting ineffective assistance of counsel"].)

**D.** *Firearm Enhancements at Sentencing*

Hernandez's fourth and final contention on appeal is that his sentence should be modified because the trial court erred in denying his request to strike firearm enhancements at sentencing. A trial court decision to deny such a request is reviewed for abuse of discretion (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298 (*Mendoza*)); and "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

### 1. Denial of the Request to Strike Firearm Enhancements

As noted *ante*, the jury made findings relating to the use of a firearm and infliction of great bodily injury and death. Specifically, the jury concluded that Hernandez had personally and/or intentionally "used a firearm," "discharged a firearm," "proximately caused great bodily injury and death to a person," and "inflicted great bodily injury upon Carlos" within the meaning of Penal Code sections 12022.7, subdivision (a), and 12022.53, subdivisions (b), (c), and (d)."

At sentencing, Hernandez requested that these firearm enhancements be stricken on the basis that Hernandez was "a family person" who had been "active [in] coaching his son's baseball, active with his family, active with his kids;" his "criminal record [was] minimal;" and he had come "from a background of instability," having "[r]ight from the start . . . [been] abandoned, first emotionally, and then physically by his own father" and, thereafter, been "physically and emotionally abused . . . for years on end" by the man in his mother's life with whom he developed the closest relationship. But the trial court found that striking the enhancements would result in a threat to public safety; and, on this basis, it denied Hernandez's request.

## 2. Analysis

Firearm enhancements are consequential to the sentencing of persons convicted of the gravest of felonies because they add double-digit years to the sentence of a person who, in the commission of such a felony, "personally uses" or "personally and intentionally discharges" a firearm.  (See Pen. Code §§ 12022.53, subds. (a)(1) & (18), (b), (c), and (d).)  On a verdict of murder or attempted murder, the number of additional years is 10 for "personally *us*[*ing*] a firearm," and 20 for "personally and intentionally *discharg*[*ing*] a firearm."  (Pen. Code § 12022.53, subds. (a)(1) & (18), (b), and (c), italics added.)  On a verdict of either of those offenses or of discharging a firearm at an occupied motor vehicle, the number of additional years is 25 for "personally and intentionally *discharg*[*ing*] a firearm and proximately *caus*[*ing*] *great bodily injury . . . or death . . .* to a person other than an accomplice."  (Pen. Code § 12022.53, subds. (a)(1) & (18), and (d), italics added.)

The language in which these provisions are framed is one of absolutes and mandates.  (See, e.g.,  Pen. Code § 12022.53, subd. (b) ["*Notwithstanding any other law,* a person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, *shall* be punished by an additional and consecutive term of imprisonment in the state prison for 10 years;" italics added].)  But, however absolute these mandates may *seem*, they nonetheless are subject to judicial discretion (see Pen. Code §§ 12022.53, subd. (h), and 1385, subd. (c)(2)) and to the application of "mitigating circumstances" (see Pen. Code § 1385, subd. (c)(2)); and the mitigating circumstances in turn are subject to what we shall refer to as overriding circumstances.

Focusing first on judicial discretion and mitigating circumstances, we note three provisions of the Penal Code that furnish courts with discretion and in fact encouragement to strike or dismiss firearm enhancements:

26

(i) Section 12022.53, subdivision (h), provides that a "court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section"; (ii) section 1385, subdivision (c)(1), provides that, "[n]otwithstanding any other law" and unless "prohibited by any initiative statute," "the court shall dismiss an enhancement if it is in the furtherance of justice to do so"; and (iii) section 1385, subdivision (c)(2), furnishes a non-exclusive (see Pen. Code § 1385, subd. (c)(4)) list of nine "mitigating circumstances" that the Legislature has instructed courts to "weigh[ ] greatly in favor of dismissing the enhancement."

However, as noted *ante*, each of these limitations on the application of enhancements in sentencing is itself limited. Thus, for example, discretion to strike or dismiss an enhancement under section 12022.53, subdivision (h), or section 1385, subdivision (c)(1), may be exercised only "if [such] dismissal is [not] prohibited by any initiative statute" and is "in the furtherance of justice." (Pen. Code § 1385, subd. (c)(1), § 12022.53, subd. (h).) And the Legislature's instruction that great weight is to be accorded to mitigating circumstances is overridden by an accompanying instruction that primacy is to be given to the interests of public safety. Specifically, section 1385, subdivision (c)(2), provides that: "Proof of the presence of one or more of [the mitigating] circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."[14]

_____

14 " 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (Pen. Code § 1385, subd. (c)(2).)

As noted *ante*, the trial court in this case made precisely such a finding at the time of sentencing; and we conclude it was operating well within the bounds of its discretion in doing so. Indeed, the evidence in this case revealed that, on a trivial provocation, Hernandez had pursued and of a sudden accosted a pair of unsuspecting teenagers, that he had in effect trapped them in the car in which they were traveling and unloosed on them a fusillade of bullets that killed one and wounded the other. He comported himself callously and with extreme violence in a manner that the jury concluded had been "willful, deliberate and premeditated." Even three years later, he boasted about the violence and destruction he had wrought on the evening of the shooting, about the sophistication of the crew that helped him cover his tracks, and about his intention to inflict violence on somebody else (his father-in-law).

Under these circumstances, the trial court's finding that dismissal of the firearm enhancements would result in a threat to public safety can hardly be said to have been "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at 377; accord *Mendoza, supra,* 88 Cal.App.5th at p. 299.) Indeed, on the evidence admitted at trial, neither this determination nor the court's resulting denial of the defense request to strike the enhancements was irrational or arbitrary at all.

## III.

## DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.